**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON,

Plaintiff,

v.

U.S. DEPARTMENT OF HOMELAND SECURITY, et al.,

Defendants.

Case No. 1:26-cv-03393

# MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

**TABLE OF CONTENTS**


INTRODUCTION ..... 1

BACKGROUND ..... 4

I. Factual Background ..... 4

A. DHS claims, without evidence, that over a quarter of a million non-citizens were registered to vote in just four states. ..... 4

B. State election officials demand more information, but DHS's responses only caused more confusion. ..... 5

C. Congress raises concerns. ..... 8

II. Procedural Background ..... 11

LEGAL STANDARD ..... 12

ARGUMENT ..... 13

I. CREW is likely to succeed on the merits ..... 13

A. Defendants have failed to meet their statutory deadlines to issue determinations on CREW's FOIA requests ..... 13

B. CREW is entitled to expedited processing ..... 15

II. CREW will Suffer Irreparable Harm Absent Preliminary Relief ..... 21

III. The balance of the equities and the public interest both support CREW's request for a preliminary injunction. ..... 25

IV. The Court should order an expedited processing rate of 1,000 pages per week. ..... 26

CONCLUSION ..... 27

## TABLE OF AUTHORITIES

**Cases**

*Al-Fayed v. CIA*,
254 F.3d 300 (D.C. Cir. 2001) .....17

*Am. Immigr. Council v. DHS*,
470 F. Supp. 3d 32 (D.D.C. 2020) .....24

*American Oversight v. DOJ*,
292 F. Supp. 3d 501 (D.D.C. 2018) .....20

*American Oversight v. U.S. Dep't of State*,
414 F. Supp. 3d 182 (D.D.C. 2019) .....13, 14, 15

*Brennan Ctr. for Just. v. Dep't of Com.*,
498 F. Supp. 3d 87 (D.D.C. 2020) .....13, 22

*Bush v. Gore*,
531 U.S. 1046 (2000) .....23

*Citizens for Resp. & Ethics in Wash. v. DOJ*,
436 F. Supp. 3d 354 (D.D.C. 2020) .....15

*Citizens for Resp. & Ethics in Wash. v. DOJ*,
820 F. Supp. 2d 39 (D.D.C. 2011) .....17

*Citizens for Resp. & Ethics in Wash. v. DOJ*,
826 F. Supp. 3d 73 (D.D.C. 2026) ..... *passim*

*Citizens for Resp. & Ethics in Wash. v. Fed. Election Comm'n*,
711 F.3d 180 (D.C. Cir. 2013) .....14

*Citizens for Resp. & Ethics in Wash. v. U.S. DOGE Serv.*,
769 F. Supp. 3d 8 (D.D.C. 2025) .....13, 17, 19

*Clemente v. FBI*,
71 F. Supp. 3d 262 (D.D.C. 2014) .....27

*CREW v. DOJ*,
25-cv-4426-CKK, ECF No. 18 (Mar. 24, 2026) .....27

*Ctr. for Pub. Integrity v. U.S. Dep't of Def.*,
411 F. Supp. 3d 5 (D.D.C. 2019) .....13, 15, 24, 26

*Democracy Forward Found. v. DOJ*,
813 F. Supp. 3d 1 (D.D.C. 2025) .....20, 21

*DHS v. League of Women Voters*,
No. 26A308, 2026 WL 2879700 (U.S. Sept. 25, 2026) .....7, 25

*Dunlap v. Presidential Advisory Comm'n on Election Integrity*,
286 F. Supp. 3d 96 (D.D.C. 2017) .....24

*Edmonds v. FBI*,
417 F.3d 1319 (D.C. Cir. 2005) .....15

*Elec. Priv. Info. Ctr. v. DOJ*,
416 F. Supp. 2d 30 (D.D.C. 2006) .....13, 27

**Cases-Cont.**

*Judicial Watch, Inc. v. U.S. Dep't of Energy*,
191 F. Supp. 2d 138 (D.D.C. 2002) .......... 27

*Landmark Legal Found. v. EPA*,
910 F. Supp. 2d 270 (D.D.C. 2012) .......... 16

*Leadership Conf. on C.R. v. Gonzales*,
404 F. Supp. 2d 246 (D.D.C. 2005) .......... 18

*League of Women Voters of United States v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) .......... 23, 24

*League of Women Voters v. DHS*,
835 F. Supp. 3d 79 (D.D.C. 2026) .......... 6, 8, 18, 25

*Nat. Res. Def. Council v. U.S. Dep't of Energy*,
191 F. Supp. 2d 41 (D.D.C. 2002) .......... 27

*Neguse v. ICE*,
813 F. Supp. 3d 45 (D.D.C. 2025) .......... 22

*Nken v. Holder*,
556 U.S. 418 (2009) .......... 13

*NLRB v. Robbins Tire & Rubber Co.*,
437 U.S. 214 (1978) .......... 1

*Open Soc'y Just. Initiative v. CIA*,
399 F. Supp. 3d 161 (S.D.N.Y. 2019) .......... 27

*Protect Democracy Project, Inc. v. DOJ*,
498 F. Supp. 3d 132 (D.D.C. 2020) .......... 17, 19, 22, 26

*Protect Democracy Project, Inc. v. U.S. Dep't of Def.*,
263 F. Supp. 3d 293 (D.D.C. 2017) .......... 19, 25, 26

*Wash. Post v. DHS*,
459 F. Supp. 2d 61 (D.D.C. 2006) .......... 13, 18, 22

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) .......... 12

**Statutes & Regulations**

5 U.S.C.
§ 552(a)(6)(A)(i) .......... 14
§ 552(a)(6)(B)(i) .......... 14
§ 552(a)(6)(C)(i) .......... 14
§ 552(a)(6)(E)(i)(I) .......... 16
§ 552(a)(6)(E)(ii)(I) .......... 15
§ 552(a)(6)(E)(iii) .......... 15
§ 552(a)(6)(E)(v)(II) .......... 16
§ 552(f) .......... 20

52 U.S.C. § 20507(c)(2)(A) .......... 7, 18

Nev. Rev. Stat. § 205.4765 (2025) .......... 10

**Statutes & Regulations-Cont.**

6 C.F.R.
§ 5.5(e)(1)(i)-(iv)....................16
§ 5.5(e)(1)(ii)....................16
§ 5.5(e)(1)(iv)....................20

**Other Authorities**

Ali Swenson, *Administration's Focus on Noncitizen Voting Has Led to 160 Arrests. Experts Say That Shows It's Rare*, ABC News (Sept. 22, 2026)....................21

Gabe Cohen, Priscilla Alvarez, & Tierney Sneed, *Markwayne Mullin Uses Homeland Security to Further Trump's Voter Fraud Crusade*, CNN (Aug. 12, 2026) ....................2

Gabe Cohen, *Trump Officials Touted a Voter Fraud Bombshell. Their Data Hasn't Proved It*, CNN (Aug. 21, 2026)....................21

Secretary Markwayne Mullin (@SecMullinDHS), X (July 17, 2026) ....................1

Letter from 34 U.S. Senators to Sec'y Markwayne Mullin, U.S. Dep't of Homeland Sec., (Sept. 29, 2026) ....................10, 11

Letter from Al Schmidt, Sec'y of the Commonwealth of Pa., to Sec'y Markwayne Mullin, U.S. Dep't of Homeland Sec. (July 29, 2026) ....................6, 8, 9

Letter from Francisco V. Aguilar, Nev. Sec'y of State, to Sec'y Markwayne Mullin, U.S. Dep't of Homeland Sec. (July 29, 2026) ....................6

Letter from Shirley N. Weber, Cal. Sec'y of State, to Sec'y Markwayne Mullin, U.S. Dep't of Homeland Sec. (July 23, 2026) ....................6

Letter from U.S. Dep't of Homeland Sec. Off. of Intergovernmental Affs. to Al Schmidt, Sec'y of the Commonwealth of Pa. (Sept. 9, 2026) ....................2, 5

Letter from U.S. Sen. Alex Padilla and U.S. Sen. Charles E. Schumer to Sec'y Markwayne Mullin, U.S. Dep't of Homeland Sec., and Dir. Joseph B. Edlow, U.S. Citizenship and Immigr. Servs. (Sept. 13, 2026)....................9

Mike Catalini & Ali Swenson, *Noncitizen Voting Claims Animate Trump's Attacks on Midterms and Set Up Potential Result Challenges*, Assoc. Press (Aug. 29, 2026)....................21

Nick Corasaniti, *From 16,000 to 185 to Zero: Trump's Claims of Illegal Voting in Nevada Fizzle.*, N.Y. Times (Sept. 24, 2026) ....................2

Nick Corasaniti & Hamed Aleaziz, *Trump Administration Begins Blitz to Find Elusive Voter Fraud Ahead of Midterms*, N.Y. Times (Sept. 2, 2026)....................21

Nick Corasaniti, *Homeland Security Made a Big Claim About Noncitizen Voting. Now It Can't Prove It.*, N.Y. Times (Aug. 20, 2026) ....................2

Pa. Voter Servs., *Find Your Voter Registration Status* (last visited Sept. 21, 2026)....................10

Peter Elkind et al., *Inside Trump's Failed Hunt for Noncitizen Voters*, ProPublica (Aug. 14, 2026)....................21

Peter Elkind et al., *Inside Trump's Failed Hunt for Voter Rolls Were Inflated*, NPR (Aug. 25, 2026) ....................2

**Other Authorities-Cont.**

Press Release, U.S. Dep't of Homeland Sec., *Preventing Alien Voting* (July 16, 2026) ....1

Cal. Sec'y of State, *Check Your Registration Status*, https://voterstatus.sos.ca.gov/ (last visited Sept. 21, 2026) ....10

Nev. Sec'y of State, *Registered Voter Services*, https://www.nvsos.gov/votersearch/ (last visited Sept. 21, 2026) ....9

U.S. Dep't of Homeland Sec., *Secretary Mullin Delivers Remarks on President Trump's Update on Election Integrity Efforts* (YouTube, July 17, 2026) ....1

White House, *President Trump Delivers an Address to the Nation* (YouTube, July 16, 2026) ....1

## INTRODUCTION

This case concerns two time-sensitive Freedom of Information Act ("FOIA") requests for records relating to the Administration's baseless claims about alleged non-citizen voting in federal elections. Expedited resolution of this case is necessary to fulfill FOIA's "basic purpose": "to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978).

Just months ahead of the November midterm elections, the Department of Homeland Security ("DHS") and Secretary of Homeland Security Markwayne Mullin have publicly made unsubstantiated claims that hundreds of thousands of "non-citizens" were illegally registered to vote in California, Pennsylvania, Nevada, and New Jersey.[1] DHS and Secretary Mullin disseminated these claims through a purported factsheet posted to the White House website, letters to the four states' top election officials posted to Secretary Mullin's X account, and a press conference.[2] Notably missing was any explanation as to *how* DHS arrived at these numbers. Election officials in California, Pennsylvania, and Nevada were blindsided by the claims and wrote to demand DHS's methodology and underlying data.[3]

[1] The White House, *President Trump Delivers an Address to the Nation*, at 34:33–35:23 (YouTube, July 16, 2026), https://tinyurl.com/yckcuf63 (hereinafter "President Trump's Address"); Press Release, U.S. Dep't of Homeland Sec., *Preventing Alien Voting* (July 16, 2026), https://tinyurl.com/4cprz42f (filed under "Noncitizens on State Voter Rolls") (hereinafter "DHS Factsheet").

[2] DHS Factsheet, *supra* note 1; Secretary Markwayne Mullin (@SecMullinDHS), X (July 17, 2026), https://tinyurl.com/yc4eysfr (hereinafter "DHS Letters to States"); U.S. Dep't of Homeland Sec., *Secretary Mullin Delivers Remarks on President Trump's Update on Election Integrity Efforts*, at 15:29–16:19 (YouTube, July 17, 2026), https://tinyurl.com/57v8hkzn (hereinafter "Sec'y Mullin's Remarks').

[3] Gabe Cohen, Priscilla Alvarez, & Tierney Sneed, *Markwayne Mullin Uses Homeland Security to Further Trump's Voter Fraud Crusade*, CNN (Aug. 12, 2026), https://tinyurl.com/4w2pjcmn.

DHS's responses have only added to the confusion. In a meeting with Nevada election officials, the agency acknowledged that its initial claim that nearly 16,000 non-citizens were registered to vote in Nevada was only "the ceiling," rather than an accurate count.[4] It provided information about only 185 potential non-citizens, and claimed it was still reviewing 14,000 other registrants.[5] Nevada election officials recently confirmed that upon investigation, even these 185 registrants turned out to be U.S. citizens.[6] Pennsylvania election officials who spoke with DHS similarly reported that the agency did not show "high confidence" in the accuracy of its claims.[7]

All the while, DHS has made contradictory statements about its methodology. In initial letters to states, it claimed it used "publicly available data," including "name, date of birth, address, and Social Security number[s]"—the latter of which is not publicly available—to match state voter registrants against DHS's own records.[8] In a more recent email to Pennsylvania election officials, DHS claimed it used a "6-attribute" matching process that considered first name, last name, middle name, date of birth, address, and phone number.[9]

In an attempt to put DHS's claims in context and to counter its efforts to undermine public confidence in our nation's elections system, CREW submitted identical FOIA requests to DHS and its component, U.S. Citizenship and Immigration Services ("USCIS") on August 14, 2026. Declaration of Lauren C. Bingham ("CREW Decl."), Exs. A and B. CREW sought records

---

[4] Nick Corasaniti, *Homeland Security Made a Big Claim About Noncitizen Voting. Now It Can't Prove It.*, N.Y. Times (Aug. 20, 2026), https://tinyurl.com/5hajv42h.

[5] *Id.*

[6] Nick Corasaniti, *From 16,000 to 185 to Zero: Trump's Claims of Illegal Voting in Nevada Fizzle.*, N.Y. Times (Sept. 24, 2026), https://tinyurl.com/5e7h64cd.

[7] c*Voter Rolls Were Inflated*, NPR (Aug. 25, 2026), https://tinyurl.com/565rjcvb.

[8] DHS Letters to States, *supra* note 2.

[9] Letter from U.S. Dep't of Homeland Sec. Off. of Intergovernmental Affs. to Al Schmidt, Sec'y of the Commonwealth of Pa. (Sept. 9, 2026), https://tinyurl.com/2w9r2ue6 ("DHS IGA Email").

concerning the data sources and methodology DHS used to make its claims regarding the number of non-citizens registered to vote. Noting the widespread media coverage of DHS's actions and the fast-approaching election, CREW asked that its requests be processed on an expedited basis. But USCIS denied expedited processing and failed to meet its statutory deadline to determine whether it would produce the requested records. And DHS transferred the request to USCIS, stating that the request was within USCIS's "purview," despite the Secretary's personal involvement in amplifying these claims. CREW brought this lawsuit and now seeks preliminary relief requiring expedited processing of the requested records in order to shed light on the government's claims in advance of the election and swearing-in of the new Congress, after which the value of these records will be diminished.

CREW meets each requirement for preliminary relief. CREW is likely to succeed on the merits. Defendants indisputably failed to meet their statutory deadlines for processing CREW's FOIA requests. In addition, CREW is entitled to expedited processing on two separate grounds. First, CREW is primarily a disseminator of information, and there is an urgency to inform the public about the undisclosed methodology underlying Defendants' claims of alleged non-citizen voting in advance of fast-approaching midterm elections. Second, as the myriad of news sources cited in CREW's requests demonstrates, this is a matter of widespread concern for the media and the public that implicates the government's integrity and affects public confidence.

Moreover, CREW will be irreparably harmed absent expedited processing and production of the requested records. There are three, imminent events approaching, after which the utility of the requested records will diminish. The first is the midterm elections. The requested records are most valuable in advance of the election, as their release will ensure that the electorate has the necessary information underlying DHS's unsubstantiated claims before they cast a ballot. Second,

even after the election, the records are highly valuable during the period between the election and the swearing-in of the next Congress, since they could rebut DHS's claims of widespread voter fraud and bolster public confidence in the integrity of the election results. And third, the public needs the requested records now and in the immediate future in order to assess whether DHS has violated state or federal law, stop any ongoing illegal conduct, and prevent further harm. For the same reasons, expedited release of the requested records serves strong public interests that outweigh any minimal burden to Defendants.

The Court should issue a preliminary injunction requiring Defendants to expedite processing of CREW's FOIA requests at a rate of 1,000 pages of potentially responsive records per week, and to produce any non-exempt responsive records—accompanied by a *Vaughn* index, if appropriate—on a rolling basis every week until all non-exempt responsive records have been released.

## BACKGROUND

### I. Factual Background

#### A. DHS claims, without evidence, that over a quarter of a million non-citizens were registered to vote in just four states.

In a July 16, 2026, press conference, President Donald Trump announced a "stunning investigation by the Department of Homeland Security" that had identified "approximately 278,000 noncitizens who are registered to vote in federal elections."[10] He went on to assert that the United States is experiencing "a crisis of election security," that the "election system [is] so broken and so vulnerable that no one can possibly defend it," and that elections are "vulnerable to being rigged and stolen."[11] Around the same time, DHS released a purported factsheet asserting

[10] President Trump's Address, *supra* note 1, at 34:33–35:23.
[11] *Id*. at 35:15-37:39.

that "over 250,000 non-citizens are illegally registered to vote" in California, Pennsylvania, New Jersey, and Nevada.[12]

Secretary Mullin echoed these claims in letters to the four states' top election officials.[13] The letters, dated July 16, 2026, stated that the agency used "publicly available voter registration" data to compare registrants' "name[s], date[s] of birth, address[es], and Social Security number[s]" to those of "non-citizen[s]" in its own records. The letters contained state-specific estimates of non-citizen registrants and asked states to contact DHS to "positively identify" these registrants and "take steps to protect" their electorates by July 30, 2026.[14]

The letters, which Secretary Mullin simultaneously posted to X, seem to address the public as much as state election officials. They emphasized that "[a]llowing just one non-citizen to vote cancels the vote of one U.S. citizen" and urged election officials to "ensure that ineligible voters will not impact upcoming federal elections."[15]

The next day, Secretary Mullin doubled down. In a press conference, he promised to investigate "who voted" in non-complying states and hold "election officials accountable" with "fines," "penalties," and even "prison time."[16]

**B. State election officials demand more information, but DHS's responses only caused more confusion.**

State election officials were reportedly "blindsided" by DHS's claims.[17] The Secretaries of State of California, and Nevada, and the Secretary of the Commonwealth of Pennsylvania each

---

[12] DHS Factsheet, *supra* note 1.

[13] DHS Letters to States, *supra* note 2.

[14] *Id.*

[15] *Id.*

[16] Sec'y Mullin's Remarks, *supra* note 2, at 15:29–16:19.

[17] Cohen, Alvarez, & Sneed, *supra* note 3.

wrote to DHS demanding the data and methodology DHS used in its analysis.[18] All three emphasized their commitment to maintaining accurate voter rolls and raised concerns about the accuracy of DHS's data.[19] Two questioned how DHS could have lawfully compiled the data: California noted that a federal court had rejected the Department of Justice's attempt to obtain its confidential voter registration list, and Nevada pointed out that another federal court had on June 22, 2026, vacated DHS's modified Systematic Alien Verification for Entitlement ("SAVE") database, which DHS used to run bulk voter citizenship checks.[20] *See League of Women Voters v. DHS*, 835 F. Supp. 3d 79, 95-96 (D.D.C. 2026) (holding unlawful and vacating DHS's 2025 modifications to the SAVE system for mass "voter verification" checks). DHS was prohibited from using modified SAVE (except in Florida, Indiana, Iowa, and Ohio) until the Supreme Court stayed that order. *DHS v. League of Women Voters*, No. 26A308, 2026 WL 2879700 (U.S. Sept. 25, 2026).

California, Pennsylvania, and Nevada officials also raised serious concerns about complying with DHS's demands. All three suggested that collaborating with DHS to investigate the flagged voters could compromise voter privacy in violation of state law.[21] California and Nevada officials also argued that cancelling the flagged voters' registration could run afoul of the

---

[18] Letter from Shirley N. Weber, Cal. Sec'y of State, to Sec'y Markwayne Mullin, U.S. Dep't of Homeland Sec. (July 23, 2026), https://tinyurl.com/yx4jtsur (hereinafter "Weber Letter"); Letter from Francisco V. Aguilar, Nev. Sec'y of State, to Sec'y Markwayne Mullin, U.S. Dep't of Homeland Sec. (July 29, 2026), https://tinyurl.com/4zvznb3u (hereinafter "Aguilar Letter"); Letter from Al Schmidt, Sec'y of the Commonwealth of Pa., to Sec'y Markwayne Mullin, U.S. Dep't of Homeland Sec. (July 29, 2026), https://tinyurl.com/5n96mwxp (hereinafter "Schmidt Letter").

[19] Weber Letter, *supra* note 18, at 1; Schmidt Letter, *supra* note 18, at 1-2; Aguilar Letter, *supra* note 18, at 1-2.

[20] Weber Letter, *supra* note 18, at 1; Aguilar Letter, *supra* note 18, at 1-2.

[21] Weber Letter, *supra* note 18, at 1; Schmidt Letter, *supra* note 18, at 1; Aguilar Letter, *supra* note 18, at 3.

National Voter Registration Act ("NVRA"),[22] which prohibits the systematic cancellation of voter registrations in the 90 days before a federal election. *See* 52 U.S.C. § 20507(c)(2)(A).

In a meeting with Nevada election officials in August, DHS acknowledged that its claim that 15,903 non-citizens were registered to vote in the state was "the ceiling" rather than an accurate count.[23] It provided Nevada election officials with just 185 voter ID numbers for registrants it believed were non-citizens, and stated that it was still reviewing 14,000 other registrants.[24] Nevada election officials reported that the data DHS shared was difficult to verify, as it lacked basic information like registrants' names.[25] And on September 24, 2026, media reports indicated that Nevada officials sent a letter to DHS stating that "[a]s for the 185 individuals, our records indicate that they were citizens," and that DHS had not provided sufficient information to verify their claims.[26]

Pennsylvania election officials had a phone call with DHS around the same time. One state official told NPR that "[i]t was clear that DHS did not have confidence that the numbers they have stated publicly were accurate."[27] On September 9, 2026, the DHS Office of Intergovernmental Affairs responded in an email that this was a "blatant mischaracterization" and that Pennsylvania election officials should "carefully review" the eligibility of all 14,576 registrants flagged.[28]

The September 9 email also contradicted DHS's previous statements about its methodology. In the email, DHS asserted that it had used a "6-attribute" matching process to match

---

[22] Weber Letter, *supra* note 18, at 1-2; Aguilar Letter, *supra* note 18, at 3.
[23] Corasaniti, *supra* note 4.
[24] Joffe-Block & Parks, *supra* note 7.
[25] Corasaniti, *supra* note 4.
[26] Corasaniti, *supra* note 6.
[27] Joffe-Block & Parks, *supra* note 7.
[28] DHS IGA Email, *supra* note 9, at 1-2.

the state's "publicly available voter file" against its own immigration records.[29] It compared "first name, last name, middle name, date of birth, address, and phone number" and drew on various other data in its records, including "previous addresses or spousal information."[30] The email did not explain the discrepancy between this process and the one Secretary Mullin described in his letters to the four states. It promised to send Pennsylvania election officials a "list of state voter IDs" of potential non-citizens, but it is not clear whether DHS has done so.[31] The email stated that DHS previously discussed the SAVE system with Pennsylvania election officials, explaining that "President Trump has made the SAVE system available to state and local election officials at no cost," and described its SSN search features in the present tense, despite the court order then in force vacating that functionality of the modified SAVE system.[32] *See League of Women Voters*, 835 F. Supp. 3d at 95-96. It suggested that Pennsylvania election officials share "federal enumerators," described earlier in the email as "Social Security number[s] or [] alien number[s]," for a subset of the flagged registrants.[33] It explained that with federal enumerators, it could provide "a list of **confirmed** non-citizens."[34] The email seems to imply that DHS would run the federal enumerators through the modified SAVE database, despite that database having been vacated until the Supreme Court's action on September 25, 2026.

**C. Congress raises concerns.**

A recent whistleblower report published by United States Senators Alex Padilla and Chuck Schumer on September 13, 2026, suggests that DHS has been accessing state voter data through

---

[29] *Id*. at 1.
[30] *Id*.
[31] *Id*. at 2.
[32] *Id*.
[33] *Id*. at 2, 1.
[34] *Id*. at 2 (emphasis in original).

illegal means.[35] The whistleblower alleged that DHS directed personnel to access voter information through tools designed to allow individual voters to check their own registration.[36] The report explained that some states require users to attest that they are the voter or have the express authorization of the voter to view an individual voter file, and make it a crime to falsely make that attestation.[37] Nevada's "Registered Voter Services" tool, for example, notes in prominent, red text:

> "Please note: The voter information on this site is for individuals. The information is only intended for the voter who asked for it. This information is not to be shared, distributed, or given to a third party. You can only use information from this site for reasons allowed by local, state, or federal law.
> By continuing, you confirm that you are that voter or are directly helping that voter. You also confirm that you will look at only that voter's registration information. By using this site, you agree not to use or share the information for any reason that the law does not allow."[38]

And under Nevada law, it is a misdemeanor to "knowingly, willfully and without authorization" "obtain[] or attempt[] to obtain access to" data in a "computer, system or network." Nev. Rev. Stat. § 205.4765 (2025). California and Pennsylvania's search tools are also explicitly designed for use by individual voters.[39] According to the whistleblower, some within DHS expressed concern that by accessing these sites, they would be misrepresenting themselves as individual voters and could

---

[35] Letter from U.S. Sen. Alex Padilla and U.S. Sen. Charles E. Schumer to Sec'y Markwayne Mullin, U.S. Dep't of Homeland Sec., and Dir. Joseph B. Edlow, U.S. Citizenship and Immigr. Servs. (Sept. 13, 2026), https://perma.cc/ZB9T-FC96 (hereinafter "Whistleblower Report").

[36] *Id*. at 8.

[37] *Id*.

[38] Nev. Sec'y of State, *Registered Voter Services*, https://www.nvsos.gov/votersearch/ (last visited Sept. 21, 2026).

[39] Pa. Voter Servs., *Find Your Voter Registration Status*, https://tinyurl.com/2yez3cm3 (last visited Sept. 21, 2026); Cal. Sec'y of State, *Check Your Registration Status*, https://voterstatus.sos.ca.gov/ (last visited Sept. 21, 2026).

be subject to legal liability.[40] Senators Padilla and Schumer also indicated that DHS's use of voter registration tools are not "routine uses" permitted under the Privacy Act.[41]

Finally, on September 25, 2026, a group of 34 United States Senators wrote to Secretary Mullin to "warn [] against continued activities at the Department of Homeland Security (DHS) that seek to undermine the Constitutional authority of both Congress and states to administer elections and defy the directions of federal courts."[42] Among the activities about which the senators expressed concern was that on "July 17, 2026, [Secretary Mullin] claimed, without evidence, that 250,000 non-citizens were registered to vote in four states," noting that "[t]his claim has been refuted by states and even by other administration officials."[43] The senators specifically noted that DHS "claimed that around 16,000 noncitizens illegally registered to vote in Nevada, but later, other DHS officials alleged the number was only 185," and "Nevada state officials found all 185 individuals were U.S. citizens."[44] The senators stated that "[c]onsidering the inaccuracies in SSA's citizenship categorizations and the questions surrounding how you obtained the voter roll information needed to analyze this data, we cannot trust the numbers as reported."[45] The letter concluded with the senators' concerns that "unsubstantiated allegations of noncitizen voter fraud, public recitation of unreliable data, and unwarranted conditioning of continued grant funding for state election security measures on compliance with politically motivated requests for voter data

---

[40] Whistleblower Report, *supra* note 35, at 22.

[41] Whistleblower Report, *supra* note 35, at 2.

[42] Letter from 34 U.S. Senators to Sec'y Markwayne Mullin, U.S. Dep't of Homeland Sec., 1 (Sept. 29, 2026), https://perma.cc/T7GM-NGPF (hereinafter, "Senators' Letter to Sec'y Mullin").

[43] *Id*. at 2.

[44] *Id*.

[45] *Id*.

appear to be calculated efforts to undermine confidence in our elections and risks wrongly disenfranchising voters."[46]

## II. Procedural Background

CREW submitted identical FOIA requests to DHS and USCIS on August 14, 2026. CREW Decl. Exs. A and B. The requests sought:

1. Records sufficient to show the methodology, criteria, and analytical process used to generate the following the numerical claims made publicly by DHS and the President on or about July 16 and 17, 2026 regarding non-citizens registered to vote, including:

    a. The claim that over 250,000 non-citizens are illegally registered to vote in California, Pennsylvania, New Jersey, and Nevada;
    b. The state-specific figures of 190,832 (California), 35,152 (New Jersey), 15,903 (Nevada), and 14,576 (Pennsylvania);
    c. The claim that approximately 278,000 non-citizens are registered to vote in federal elections;
    d. The figure of 118,003 registrants across the four states whose names, dates of birth, addresses, and Social Security numbers were said to match non-citizens in DHS records; and
    e. The claims that the SAVE system enabled participating states to identify over 400,000 deceased registrants and over 28,000 non-citizen registrants.

    This request includes, but is not limited to, records sufficient to show: the data sources used to generate these figures; the matching criteria, thresholds, and confidence levels; any code, scripts, queries, models, or algorithms used; any documentation distinguishing "potential," "possible," and confirmed matches; and any documented or estimated error, false-positive, or false-negative rates.

2. All records reflecting internal assessments of the accuracy, reliability, or limitations of these numerical claims or of the underlying matching process, including quality assurance, validation, testing, sampling, and audit records, and any concerns, objections, caveats, or dissenting views raised by agency personnel.

3. All communications concerning the preparation, clearance, and approval of the DHS fact sheet titled "Preventing Alien Voting" or the DHS press release of July 17, 2026.

CREW Decl. Exs. A and B, at 1-2. Both requests sought expedited processing. *Id*. On August 25, 2026, USCIS acknowledged receipt of CREW's request and assigned it the control number

---

[46] *Id*. at 3.

COW2026005878. CREW Decl. Ex. C, at 1. It granted a fee waiver, denied expedited processing, and invoked the ten working-day extension for "unusual circumstances," citing the "scope and nature" of the request. *Id*. at 2. It did not provide a timeline as to when the requested records would be produced, and has not released any records to CREW thus far. On September 23, 2026, DHS sent CREW an email acknowledging the request, and assigning it reference number 2026-HQFO-03605. CREW Decl. Ex. D. The email stated that DHS "determined that this is a matter under the purview of the U.S. Citizenship & Immigration Services, another DHS component;" and that "therefore, [DHS is] transferring your request to the FOIA Officer for processing and direct response to you." *Id*. at 1.

On September 29, 2026, CREW filed this suit. The complaint asserts two counts. Count I asserts that Defendants unlawfully denied expedited processing of CREW's requests. Compl. at 10-11. Count II asserts that Defendants are wrongfully withholding records responsive to CREW's requests. Compl. at 12.

## LEGAL STANDARD

To obtain a preliminary injunction, a party must show that it is likely to succeed on the merits, that it is likely to suffer irreparable harm without preliminary relief, that the balance of the equities tip in its favor, and that the injunction serves the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The third and fourth requirements "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

While preliminary injunctions are not common in FOIA litigation, "courts can and do grant motions for preliminary injunctions in FOIA cases when the moving party makes 'the requisite showing' within the traditional four-factor balancing framework for preliminary equitable relief." *Citizens for Resp. & Ethics in Wash. v. DOJ ("CREW v. DOJ")*, 826 F. Supp. 3d 73, 83 (D.D.C.

2026); *accord Citizens for Resp. & Ethics in Wash. v. U.S. DOGE Serv. ("CREW v. DOGE")*, 769 F. Supp. 3d 8, 27 (D.D.C. 2025); *Brennan Ctr. for Just. v. Dep't of Com.*, 498 F. Supp. 3d 87 (D.D.C. 2020); *American Oversight v. U.S. Dep't of State*, 414 F. Supp. 3d 182 (D.D.C. 2019); *Ctr. for Pub. Integrity v. U.S. Dep't of Def.*, 411 F. Supp. 3d 5, 11 (D.D.C. 2019); *Wash. Post v. DHS*, 459 F. Supp. 2d 61 (D.D.C. 2006); *Elec. Priv. Info. Ctr. v. DOJ*, 416 F. Supp. 2d 30 (D.D.C. 2006). CREW has readily made that showing here.

## ARGUMENT

### I. CREW is likely to succeed on the merits.

CREW is likely to succeed on the merits because Defendants have (1) ignored their statutory deadlines to process CREW's FOIA requests; and (2) improperly denied or ignored CREW's requests for expedited processing, which CREW is entitled to because the requests demonstrate a "compelling need" and concern a matter of "widespread media attention."

#### A. Defendants have failed to meet their statutory deadlines to issue determinations on CREW's FOIA requests.

An agency must provide a "determination" on a FOIA request within 20 business days by "at least: (i) gather[ing] and review[ing] the documents; (ii) determin[ing] and communicat[ing] the scope of the documents it intends to produce and withhold, and the reasons for withholding any documents; and (iii) inform[ing] the requester that it can appeal whatever portion of the 'determination' is adverse." *Citizens for Resp. & Ethics in Wash. v. Fed. Election Comm'n* ("*CREW v. FEC*"), 711 F.3d 180, 188 (D.C. Cir. 2013); 5 U.S.C. § 552(a)(6)(A)(i). An agency may extend this time limit by 10 working days in "unusual circumstances," if it provides written notice to a requester. *Id*. § 552(a)(6)(B)(i). Upon determining the scope of any production, an agency must "make the records 'promptly available,' which depending on the circumstances typically would mean within days or a few weeks of a 'determination,' not months or years."

*CREW v. FEC*, 711 F.3d at 188 (quoting 5 U.S.C. §§ 552(a)(3)(A), (a)(6)(C)(i)). An agency's failure to issue a determination by statutory deadline is a violation of FOIA. *Am. Oversight*, 414 F. Supp. 3d at 186. And "FOIA specifically permits courts to 'enjoin [an] agency from withholding agency records and to order the production of any agency records improperly withheld.'" *Id*. at 184 (quoting 5 U.S.C. § 552(a)(4)(B)).

Here, DHS and USCIS have failed in their statutory obligations to make timely determinations. On August 25, 2026, USCIS acknowledged receipt of CREW's FOIA request and invoked the ten working-day extension due to the "scope and nature" of CREW's request. CREW Decl. Ex. C, at 2. On September 23, 2026 (after the 20 days had already run), DHS sent CREW an email acknowledging the request, and assigning it a reference number, and stating that DHS "determined that this is a matter under the purview of the U.S. Citizenship & Immigration Services, another DHS component;" and that "therefore, [DHS is] transferring your request to the FOIA Officer for processing and direct response to you." CREW Decl. Ex. D. Neither DHS nor USCIS have produced any documents or communicated a timeline for producing documents.

Thus, FOIA's requirement that agencies "(i) gather and review the documents; (ii) determine and communicate the scope of the documents it intends to produce and withhold, and the reasons for withholding any documents; and (iii) inform the requester that it can appeal whatever portion of the 'determination' is adverse" expired, with respect to DHS, on September 14, and with respect to USCIS, on September 28, 2026. Defendants have therefore now exceeded their statutory deadlines to determine whether to comply with CREW's records requests.

Because Defendants have violated FOIA by flouting its statutory deadlines, CREW is "certain to succeed on the merits of its claim that [Defendants] owe[] it a determination on its requests." *Am. Oversight*, 414 F. Supp. 3d at 186; *accord CREW v. DOJ*, 826 F. Supp. 3d at 86.

"And since disclosure of non-exempt documents must follow shortly thereafter, the Court may order those disclosures at the same time under its customary supervisory authority in FOIA matters." *Am. Oversight*, 414 F. Supp. 3d at 186.

**B. CREW is entitled to expedited processing.**

CREW is entitled to expedited processing of its FOIA requests, which "is a statutory right, not just a matter of court procedure." *Edmonds v. FBI*, 417 F.3d 1319, 1323 (D.C. Cir. 2005). FOIA requires an agency to notify a requester as to whether it will provide expedited processing for a records request within 10 days of the request. 5 U.S.C. § 552(a)(6)(E)(ii)(I). "A court reviews an agency's denial of expedited processing de novo." *Ctr. for Pub. Integrity v. DOD*, 411 F. Supp. 3d 5, 11 (D.D.C. 2019); *see also* 5 U.S.C. § 552(a)(6)(E)(iii). Further, where an agency's denial of expedited processing "[does] nothing more than parrot its own regulatory language, and offer[s] no reasoning or analysis, its decision, as in the APA context, is entitled to little deference." *Citizens for Resp. & Ethics in Wash. v. DOJ*, 436 F. Supp. 3d 354, 361 (D.D.C. 2020).

USCIS wrongly denied CREW's request for expedited processing, and DHS simply never responded to that request, which served as a constructive denial. *See* 5 U.S.C. § 552(a)(6)(E)(iii) (agency's failure to respond within 10 calendar days to a request for expedited processing is subject to judicial review). USCIS's denial acknowledged that requesters are entitled to expedited processing under the four circumstances described in 6 C.F.R. § 5.5(e)(1)(i)-(iv), but it did not engage with CREW's arguments that its request warranted expedition under (ii) or (iv). Compl. Ex. C at 2-3. It explained that requesters "must submit a statement…explaining in detail the basis for making the request for expedited processing" as if CREW had not done so. *Id*. at 3. It apparently rejected CREW's argument under (iv) out of hand, as it suggested CREW could respond by demonstrating "further showing as to the nature and degree of (i), (ii), or (iii) of the above categories." *Id*. And it did not explain why CREW's argument for processing under (ii) was

insufficient. This boilerplate denial is wrong, and CREW is entitled to expedited processing of its requests on two separate grounds, which it asserted in its requests.

**1. CREW is entitled to expedited processing because it has demonstrated a "compelling need."**

CREW has demonstrated a "compelling need" for the requested records. 5 U.S.C. § 552(a)(6)(E)(i)(I). Under FOIA and agency regulations, this requires that CREW is "primarily engaged in disseminating information" and that the requests show an "urgency to inform the public concerning actual or alleged Federal Government activity." *Id.* § 552(a)(6)(E)(v)(II); *accord* 6 C.F.R. § 5.5(e)(1)(ii).

**CREW is primarily an information disseminator.** A party is "primarily engaged in disseminating information" if it is their "main activity" though it need not be their "sole occupation." *Landmark Legal Found. v. EPA*, 910 F. Supp. 2d 270, 276 (D.D.C. 2012) (quoting H.R. Rep. No. 104–795, at 26 (1996)) (emphasis deleted). CREW easily meets these criteria for the reasons explained in its requests. *See* CREW Decl. Exs. A and B, at 4. CREW routinely disseminates the information it receives through FOIA requests on its website, which receives over 150,000 page views each month. *See id.* at 4. It also shares its FOIA returns with the press and is frequently cited by major news outlets. Judges in this district have repeatedly confirmed that "CREW is primarily engaged in disseminating information to the public." *CREW v. DOJ*, 826 F. Supp. 3d at 87 (citation omitted); *see also CREW v. DOGE*, 769 F. Supp. 3d at 26-27; *Citizens for Resp. & Ethics in Wash. v. DOJ*, 820 F. Supp. 2d 39, 45 (D.D.C. 2011).

**There is a clear urgency to inform the public.** In determining whether a FOIA requester has demonstrated an "urgency" that warrants expedited processing, courts must consider "(1) whether the request concerns a matter of current exigency to the American public;" (2) "the consequences of delaying a response would compromise a significant recognized interest;" and (3)

"the request concerns federal government activity." *See Al-Fayed v. CIA*, 254 F.3d 300, 310 (D.C. Cir. 2001). Each element is met here.

The requests demonstrate that they concern matters of "current exigency" to the American public because the President and DHS blindsided state election officials and the American public with their unsubstantiated claims that over a quarter of a million non-citizens are registered to vote in just four states.[47] And despite election officials' well-reasoned responses and demands for further information, DHS has refused to explain how it arrived at its conclusions. Given the fast-approaching midterm elections and the likelihood that the Administration will continue to tout these unsubstantiated claims of alleged voter fraud to dispute any election results it disfavors, this is undoubtedly a matter of "current exigency." *See CREW v. DOJ*, 826 F. Supp. 3d at 87 (holding DOJ effort to create "national voter list" was a matter of current exigency because "the election cycle is inherently time-limited"); *Protect Democracy Project, Inc. v. DOJ ("PD v. DOJ")*, 498 F. Supp. 3d 132,  140 (D.D.C. 2020) (holding that "DOJ's potential interference with postal services . . . was a matter of 'current exigency,' particularly given the imminence of Election Day and the widespread media attention to the issue of voter fraud and slowed postal service deliveries"); *see also Wash. Post v. DHS*, 459 F. Supp. 2d 61,74-75 (D.D.C. 2006) (granting preliminary injunction for White House visitor logs based on the upcoming midterm elections); *Leadership Conf. on C.R. v. Gonzales*, 404 F. Supp. 2d 246, 260 (D.D.C. 2005) (ordering expedited processing of documents concerning federal elections based on imminent expiration of the Voting Rights Act). Indeed, this exigency is confirmed by the September 25 letter from 34 U.S. Senators to DHS, stating that DHS's "unsubstantiated allegations of noncitizen voter fraud, public recitation

[47] Cohen, Alvarez, & Sneed, *supra* note 3.

of unreliable data, . . .appear to be calculated efforts to undermine confidence in our elections and risks wrongly disenfranchising voters." [48]

DHS's actions also raise questions of "current exigency" about whether it violated a federal court order by using the modified SAVE system, as the September 9 email seems to suggest by implying that DHS would run "federal enumerators" "such as Social Security number[s]" through the modified SAVE database, despite that search functionality being vacated until September 25, 2026. *See League of Women Voters*, 835 F. Supp. 3d at 95-96.

Finally, DHS's actions raise questions of "current exigency" for state election officials. The NVRA provides that states must complete "not later than 90 days prior to the date of a primary or general election for Federal office, any program… to systematically remove the names of ineligible voters from the official lists of eligible voters." 52 U.S.C. § 20507(c)(2)(A). The NVRA's "quiet period" thus began August 6, 2026, barring states from systematically removing voters from the rolls. *See id*. But DHS offered to provide Pennsylvania election officials with a "list of **confirmed** non-citizens" for the explicit purpose of "tak[ing] steps necessary to remove ineligible registrants."[49] DHS's actions may therefore pressure states to violate the NVRA's "quiet period," especially given Secretary Mullin's threats that state election officials could face criminal and civil penalties for failing to collaborate with DHS in identifying and potentially removing flagged voters. These conflicting obligations make it all the more urgent for the public to understand the basis for DHS's actions in the run-up to the midterm election.

Any delay in producing the requested records would compromise two significant recognized interests. First, it would undermine the public's interest in election integrity. *See PD v.*

[48] Senators' Letter to Sec'y Mullin, *supra* note 42, at 3.

[49] DHS IGA Email, *supra* note 9, at 2 (emphasis in original).

*DOJ*, 498 F. Supp. 3d at 140 (delay would compromise significant recognized interests in voting rights and election integrity); *CREW v. DOJ*, 826 F. Supp. 3d 73, 87–89 (D.D.C. 2026) (delay would compromise significant recognized interests in voting rights and voter privacy). Left unchecked, DHS's claims stoke fears about voter fraud, undermine public confidence in election administration, and may reduce voter participation in the upcoming election. Moreover, DHS's inaccurate information may lead to the disenfranchisement of eligible voters.

Second, delay would impair the public's ability to assess the legality of DHS's conduct. *See Protect Democracy Project, Inc. v. U.S. Dep't of Def. ("PD v. DOD")*, 263 F. Supp. 3d 293, 299–300 (D.D.C. 2017) (delay would compromise significant recognized interest because it would preclude public "from obtaining in a timely fashion information vital to the current and ongoing debate surrounding the legality of a high-profile government action" (citation modified)); *CREW v. U.S. DOGE Serv.*, 769 F. Supp. 3d 8, 27 (D.D.C. 2025) (similar). The public has a right to understand how DHS compiled these figures, and whether they illegally accessed state voter information or the modified SAVE system to do so. Similarly, the public has an interest in ensuring that state election officials do not violate the NVRA in an attempt to placate DHS. Timely production of the requested records would protect both interests.

The records also plainly concern activities of the federal government. DHS and its component USCIS are agencies within the meaning of 5 U.S.C. § 552(f), and DHS and its component USCIS are subject to FOIA. *See* C.F.R. § T.6, Ch. I, Pt. 5, Subpt. A ("Procedures for Disclosure of Records Under the Freedom of Information Act"). DHS's actions to collect and analyze state voter roll information, to publicize its conclusions about non-citizen voter registration in purported factsheets, send and publish letters, hold press conferences, and to make demands of state election officials are all federal government activities.

### 2. CREW is separately entitled to expedited processing because the requests concern a matter of widespread media attention.

CREW is also entitled to expedited processing because the requests concern a matter of "widespread and exceptional media interest in which there exist possible questions about the government's integrity which affect public confidence." 6 C.F.R. § 5.5(e)(1)(iv). In evaluating media interest, "courts in this District consider (1) the number of articles cited in the expedited processing request, (2) the dates those articles were published, (3) whether those articles were published in a variety of publications, and (4) whether those articles indicate that there is widespread national attention on the issue." *Democracy Forward Found. v. DOJ*, 813 F. Supp. 3d 1, 10-11 (D.D.C. 2025) (considering DOJ's identical regulation). A court need not find "actual evidence of government misconduct" but simply "*possible questions* regarding government integrity." *Id*. at 11. "[C]overage [that] surfaces possible ethics issues" may suffice. *American Oversight v. DOJ*, 292 F. Supp. 3d 501, 508 (D.D.C. 2018) (considering DOJ's identical regulation).

CREW's requests easily clear this bar. The requests themselves cite ten news reports released between July 16, 2026, the day of President Trump's remarks, and August 12, 2026, just two days before CREW submitted the requests. The articles were published by eight national media outlets, including the New York Times, The Washington Post, NPR, Fox News, and CBS, ABC, and NBC, *see* CREW Decl. Exs. A and B, at 4-7. Media outlets have continued to update the story since.[50] Such coverage reflects widespread media and public interest, which is only

[50] *See, e.g.*, Ali Swenson, *Administration's Focus on Noncitizen Voting Has Led to 160 Arrests. Experts Say That Shows It's Rare*, ABC News (Sept. 22, 2026), https://tinyurl.com/36jc2pf6; Nick Corasaniti & Hamed Aleaziz, *Trump Administration Begins Blitz to Find Elusive Voter Fraud Ahead of Midterms*, N.Y. Times (Sept. 2, 2026), https://tinyurl.com/n9j75kps; Mike Catalini & Ali Swenson, *Noncitizen Voting Claims Animate Trump's Attacks on Midterms and Set Up Potential Result Challenges*, Assoc. Press (Aug. 29, 2026), https://tinyurl.com/bdkbm5pr; Gabe Cohen, *Trump Officials Touted a Voter Fraud Bombshell. Their Data Hasn't Proved It*, CNN (Aug. 21,

growing as DHS releases conflicting information about its methodology and continues its engagement with state officials.[51]

Moreover, the requested records squarely implicate government integrity in multiple ways. If true, DHS's claims would undermine public confidence in state election officials' ability to maintain accurate voter rolls and in the fairness of federal elections. If untrue, they would raise questions about DHS's agenda in pushing the narrative of widespread non-citizen voting and voter fraud and suggest serious misconduct within the agency, including at the highest levels. And regardless of the truth of the claims, the requested records are likely to show whether DHS agents illegally accessed state voter information or utilized modified SAVE while it was vacated in performing the analysis. CREW does not need to show, and the Court does not need to conclude, that DHS has done anything improper. The Court only needs to conclude that there are "possible questions regarding [DHS's] integrity" worth answering. *See Democracy Forward Found. v. DOJ*, 813 F. Supp. 3d at 11. As these matters continue to interest both the media and the public and to impact public perception of the government's integrity, in the critical period of time before an election, the Court should conclude that there are.

## II. CREW will Suffer Irreparable Harm Absent Preliminary Relief

In the FOIA context, a party can show irreparable harm warranting preliminary relief by demonstrating that the requested records are "time-sensitive and highly probative, or even essential to the integrity, of an imminent event, after which the utility of the records would 'be lessened or lost.'" *Neguse v. ICE*, 813 F. Supp. 3d 45, 97-98 (D.D.C. 2025) (quoting *N.Y. Times Co. v. Def. Health Agency*, No. 21-CV-566, 2021 WL 1614817 (D.D.C. Apr. 25, 2021)). CREW has identified

2026), https://tinyurl.com/mt47uyxb; Peter Elkind et al., *Inside Trump's Failed Hunt for Noncitizen Voters*, ProPublica (Aug. 14, 2026), https://tinyurl.com/3cw93tuj.

[51] *See* DHS IGA Email, *supra* note 9.

multiple imminent events that necessitate the immediate release of these records, after which the utility of the requested records would be reduced and ultimately lost. In such cases, delayed production irreparably harms information-providers, like CREW, because "stale information is of little value." *Brennan Ctr.*, 498 F. Supp. 3d at 101 (quoting *Payne Enters. v. United States*, 837 F.2d 486, 494 (D.C. Cir. 1988)). This reasoning applies with special force where, as here, the "subject matter of [the plaintiff's] FOIA request is time sensitive due to . . . impending election[s]." *PD v. DOJ*, 498 F. Supp. 3d at 142; *accord Wash. Pos*t, 459 F. Supp. 2d at 74-75; *see also CREW v. DOJ*, 826 F. Supp. 3d at 89 ('Because CREW's request relates directly to the conduct of impending elections, CREW faces irreparable harm from any delay in processing its request.").

The first "imminent event" is the upcoming midterm elections. Multiple courts in this district have agreed that withholding information before an election can constitute irreparable harm. *See PD v. DOJ*, 498 F. Supp. 3d at 142 (finding irreparable harm because records concerning "investigations into matters potentially affecting voting rights" were "time sensitive due to the impending election, in which voting is already underway"); *CREW v. DOJ*, 826 F. Supp. 3d at 89 (finding irreparable harm because records "affect[ing] individuals' and States' decisions about how to protect both voter privacy and the fundamental right to vote" were especially time-sensitive mere weeks before an election). It is easy to understand why. Left unrebutted, DHS's claims threaten to undermine confidence in American elections, and reduce voter participation. Some voters may accept President Trump's suggestion that DHS's investigation proves that the American voting system is "broken" or "rigged" and decline to participate if they think their vote is meaningless or might be "canceled" by the vote of someone who is unlawfully registered, or simply decline to believe in the results of the election whether they participated or not. Other voters, especially those who have recently obtained citizenship, might be too intimidated by

Secretary Mullin's promise to "hunt down," "find," and "prosecute" illegal voters to show up to the polls.[52] This threatened chilling effect on voter participation cannot be undone. Once an election is over, "there can be no do over and no redress." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) (quoting *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014)).

The second "imminent event" is the period immediately following the midterm elections, from the informal "calling" of results until to the swearing-in of the next Congress. Actions that "cast[] a cloud upon" the legitimacy of an election can cause irreparable harm because "democratic stability" requires "public acceptance" of election results. *Bush v. Gore*, 531 U.S. 1046, 1047-48 (2000) (J. Scalia, concurring). DHS's unproven claims that hundreds of thousands of non-citizens are registered to vote comes with the obvious implication that they may do so in the next election. And DHS has intentionally fanned these fears, warning voters that "[a]llowing just one non-citizen to vote cancels the vote of one U.S. citizen" and urging states to "ensure that ineligible voters [do] not impact upcoming federal elections."[53] President Trump, too, has piled on, pointing to DHS's investigation as evidence that American elections are "vulnerable to being rigged and stolen."[54] The Court, like the rest of America, has seen that such inflammatory statements about "stolen" elections can lead directly to mass unrest and violent events like the January 6 attack on the U.S. Capitol, which sought to block Congress's lawful certification of the 2020 presidential election results. Almost six years after that unprecedented attack, and right after announcing DHS's findings, President Trump promised he would take steps to ensure that an election would never be

---

[52] Sec'y Mullin's Remarks, *supra* note 2, at 14:24-14:36.

[53] DHS Letters to States, *supra* note 2.

[54] President Trump's Address, *supra* note 1, at 37:31-37:39.

stolen "again."[55] The requested records are necessary to counter this dangerous rhetoric, bolster public confidence in election administration, and encourage Americans to accept the results of the midterm elections, but the records can only fulfill this function if they are timely produced.

The third "imminent event" is the continuation or recurrence of DHS's potentially illegal conduct in this matter of "ongoing public debate." "District courts in this circuit have recognized that, where an obligation to disclose exists, a plaintiff may suffer irreparable harm if denied access to information that is highly relevant to an ongoing public debate." *Am. Immigr. Council v. DHS*, 470 F. Supp. 3d 32, 38 (D.D.C. 2020). DHS's delay in processing CREW's FOIA requests concerning "ongoing proceedings of national importance" irreparably harms CREW because "'the primary value of the information lies in [CREW's] ability to inform the public' about those ongoing proceedings." *Id*. (quoting *Ctr. for Public Integrity*, 411 F. Supp. 3d at 11, 12); *accord Dunlap v. Presidential Advisory Comm'n on Election Integrity*, 286 F. Supp. 3d 96, 110 (D.D.C. 2017); *Ctr. for Public Integrity*, 411 F. Supp. 3d at 12-13 (collecting cases). This harm is compounded where the debate concerns the legality of "a high-profile government action," and that action may "recur without legal justification." *PD v. DOD*, 263 F. Supp. 3d at 299-300.

DHS's analysis of the four states' voter rolls and subsequent demands that they verify flagged voter registrants' eligibility may be illegal on at least three fronts. First, a whistleblower has alleged that DHS directed agents to pose as voters or other authorized users to access state voter data in violation of state law. Senators Padilla and Schumer also raised concerns that the same actions could violate the Privacy Act. Second, DHS may have utilized the vacated modified SAVE system in violation of a court order while that vacatur was in place. DHS's September 9 email to Pennsylvania election officials suggested that they provide "federal enumerators," such

---

[55] *Id*. at 38:16-38:50.

as alien numbers or Social Security numbers for an unspecified subset of registrants, which it would then use to "provide [election officials] with a list of **confirmed** non-citizens" (emphasis in original).[56] But if Pennsylvania officials provided DHS with a list of Social Security numbers, it is not clear how DHS could have used them to "confirm" their citizenship because DHS was prohibited from using modified SAVE's search by SSN or bulk search features from June 22 until September 25, 2026, due to court orders. *See League of Women Voters*, 835 F. Supp. 3d at 95-96 (stayed September 25, 2026, *see DHS v. League of Women Voters*, No. 26A308, 2026 WL 2879700 (U.S. Sept. 25, 2026)). Third, as evidenced by the same email, DHS is continuing to encourage states to conduct voter list maintenance and remove voters from the rolls even now that the NVRA "quiet period" for the November elections has begun, and it has not walked back its threats to prosecute and fine non-complying state election officials. The requested records would shed light on how DHS obtained the four states' voter data, what tools it used to analyze that data, and whether it intends to continue its activities despite the NVRA. This information, if produced in the coming months, would allow the American public to weigh in, curb any ongoing illegal conduct, and hold the agency accountable before any more harm is done.

## III. The balance of the equities and the public interest both support CREW's request for a preliminary injunction.

The balance of the equities and the public interest both weigh in favor of a preliminary injunction. DHS's unproven claim that over 250,000 non-citizens are registered to vote and its demand that states work with DHS to review their voter rolls "directly affect the conduct of impending elections throughout the country." *CREW v. DOJ*, 826 F. Supp. 3d at 89. As a result, "there is an unusually strong public interest in timely disclosure" of its underlying data and

---

[56] DHS IGA Email, *supra* note 9, at 2.

methodology. *Id*. The timely release of the requested documents will foster an "informed electorate," ahead of the midterm elections which "always inures to the public benefit." *Ctr. for Pub. Integrity*, 411 F. Supp. 3d at 15. Moreover, given that the records concern claims of alleged widespread non-citizen voter registration and "alleged voter fraud"—which threaten to undermine public confidence in both the administration of the midterm elections and their ultimate results—"the public interest is particularly well-served by the timely release of the requested documents." *PD v. DOJ*, 498 F. Supp. 3d at 144. Finally, timely production would benefit both the "ongoing debate" around DHS's actions and ensure the "agency's compliance with [] mandatory statutory regime[s]" which is "presumably always in the public interest." *PD v. DOD*, 263 F. Supp. 3d at 301.

These strong public interests outweigh any burden to Defendants in reprioritizing their FOIA queue, or to other FOIA requesters, who might experience some delay. The "extraordinary circumstances" of this case "warrant such line-cutting." *Ctr. for Pub. Integrity*, 411 F. Supp. 3d at 14; *see also CREW v. DOJ*, 826 F. Supp. 3d at 89-90.

## IV. The Court should order an expedited processing rate of 1,000 pages per week.

Given the urgency outlined above, the Court should order Defendants to process 1,000 pages of potentially responsive records per week, and to produce any non-exempt responsive records—accompanied by a *Vaughn* index, if appropriate—on a rolling basis every week until all non-exempt responsive records have been released. "[R]elevant case law establishes that courts have the authority to impose concrete deadlines on agencies that delay the processing of requests meriting expedition." *EPIC v. DOJ*, 416 F. Supp. 2d 30, 38 (D.D.C. 2006). And courts have ordered similar or higher processing rates, sometimes in less urgent circumstances. *See, e.g.*, *CREW v. DOJ*, 25-cv-4426-CKK, ECF No. 18, at 5 (Mar. 24, 2026) (ordering processing rate of 1,000 pages per week and rolling interim productions with a *Vaughn* index where records

concerned DOJ's nationwide collection of state voter registration data); *Clemente v. FBI*, 71 F. Supp. 3d 262, 269 (D.D.C. 2014) (ordering processing rate of 5,000 pages per month where records concerned relationship between FBI and several informants); *Nat. Res. Def. Council v. U.S. Dep't of Energy*, 191 F. Supp. 2d 41, 42-43 & n.5 (D.D.C. 2002) (ordering processing of the "vast majority of" 7,584 pages in a month where records concerned composition, activities, and operation of energy task force chaired by Vice President Cheney); *Judicial Watch, Inc. v. U.S. Dep't of Energy*, 191 F. Supp. 2d 138, 140-41 (D.D.C. 2002) (ordering processing rate of 9,000 pages in two months where records concerned same Vice Presidential task force); *Open Soc'y Just. Initiative v. CIA*, 399 F. Supp. 3d 161, 162 (S.D.N.Y. 2019) (ordering processing rate of 5,000 pages per month where records concerned assassinated journalist Jamal Khashoggi).

## CONCLUSION

The Court should issue enter a preliminary injunction requiring Defendants to expedite processing of CREW's FOIA requests at a rate of 1,000 pages of potentially responsive records per week, and to produce any non-exempt responsive records—accompanied by a *Vaughn* index, if appropriate—on a rolling basis every week until all non-exempt responsive records have been released. In addition, the Court should order the parties to submit joint status reports every 14 days.

Date: September 29, 2026

Respectfully submitted,

/s/*Lauren C. Bingham*___________

Lauren C. Bingham (D.C. Bar No. 90043462)
Samantha M. Creighton (D.C. Bar No. 90043959)*
Kayvan Farchadi (D.C. Bar No. 1672753)
John B. Hill (D.C. Bar No. 90044825)
Nikhel S. Sus (D.C. Bar No. 1017937)
CITIZENS FOR RESPONSIBILITY
AND ETHICS IN WASHINGTON
P.O. Box 14596
Washington, DC 20044

(202) 408-5565
lbingham@citizensforethics.org
screighton@citizensforethics.org
kfarchadi@citizensforethics.org
jhill@citizensforethics.org
nsus@citizensforethics.org

**pro hac vice motion forthcoming*